**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

v. CRIMINAL ACTION NO. 2:26-cr-00101

BRUCE DELANO BAKER

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant Bruce Delano Baker's Motion to Suppress Firearm Evidence. [ECF No. 26]. The Government responded in opposition on October 28, 2026. [ECF No. 31]. The Court held an evidentiary hearing on November 5, 2026, at which the court received evidence, including the testimony of the officer who conducted the traffic stop, Officer P.E. Polsley, the testimony of Defendant, the dashcam video, and the firearm at issue. [ECF No. 34]. The matter is ripe for review.

Defendant moves to suppress a firearm seized during a traffic stop from a vehicle driven in which he was a passenger. First, he argues the officer illegally initiated a traffic stop unsupported by reasonable suspicion or probable cause.[1] Second, he argues the officer's search of his person exceeded the scope of Defendant's consent. Finally, he argues the officer did not have reasonable suspicion to justify a frisk pursuant to *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

The dashcam video and Officer Polsley's testimony[2] establish (1) he had probable cause

[1] Defendant's argument contained in the briefing contests that the officer had reasonable suspicion sufficient to justify the stop, [ECF No. 26, at 2–3, 5], whereas Defendant's argument at the hearing focused on whether the officer had probable cause for the stop. *See generally* [ECF No. 34].

[2] I **FIND** Officer Polsley's testimony credible, trustworthy, and consistent with the dashcam video.

to stop the vehicle based on the defective taillight pursuant to West Virginia Code §§ 17C–15–1(a), 17C-15-5, or 17C–15–8(b); (2) Officer Polsley's search of Defendant's pockets was lawful and within the scope of Defendant's consent; and (3) Officer Polsley had reasonable suspicion to conduct a *Terry* frisk. Therefore, the Motion to Suppress Firearm Evidence, [ECF No. 26], is **DENIED**.

## I. BACKGROUND

On October 15, 2025, Officer Paul Edward Polsley ("Officer Polsley"), an officer with the Parkersburg Narcotics Task Force observed a silver Chevrolet Traverse with a defective taillight on the driver's side of the vehicle. [ECF Nos. 32, at 20:18:08–10, 20:18:14–16, 20:18:28, 20:18:47; 34].[3] According to Officer Polsley, he observed a portion of the left taillight was burnt out or nonfunctioning. [ECF No. 34]. Officer Polsley observed the vehicle turning off the road into the Piggly Wiggly grocery store parking lot. [ECF Nos. 32, at 20:18:34; 34]. Officer Polsley followed the vehicle into the parking lot and activated his emergency lights. [ECF Nos. 32, at 20:18:34; 34]. The vehicle pulled into a parking spot in front of the Piggly Wiggly grocery store, and Officer Polsley parked behind the vehicle. [ECF No. 32, at 20:18:58].

Officer Polsley explained to the driver, Luchanna Shields ("Ms. Shields"), the basis of his stop as "your driver taillight, like, half of it is burnt out."[4] *Id.* at 20:19:17–23. Officer Polsley requested Ms. Shields' driver's license, but she stated, "I do not have a driver's license" and admitted that

[3] The Government notes "[t]he stop time recorded by 911 Public Safety Telecommunications log was 20:23:37. . . . [The] Dashcam video . . . indicates the time as 20:18:58 and 50 seconds into the video recording. References to the time will be made using the time on the dashcam video as it provides continuous counting throughout the encounter. [ECF No. 31, at 2 (first citing [ECF No. 31-1, at 1]); and then citing [ECF No. 32])]. For the same reason, the court cites the time on the dashcam video.

[4] Officer Polsley also stated to Ms. Shields "the little black border around your license plate. If it covers up anything in the state of West Virginia—its illegal." [ECF No. 32, at 20:19:26–31]. However, the Government states it "does not rely on this [basis] as creating reasonable suspicion for [the] traffic stop." [ECF No. 31, at 2 n.3 (citing W. Va. Code § 17A-3-15)].

her license was suspended because of a DUI. *Id.* at 20:19:38–45, 20:20:26. Thereafter, Officer Polsley stated to Defendant, who was sitting in the passenger seat of the vehicle, "You got a license? Can I see yours?" *Id.* at 20:19:48. Ms. Shields further stated the car belonged to a friend, who she would need to text for insurance information. *Id.* at 20:20:07–10.

Officer Polsley asked "[w]here you guys coming from?" Ms. Shields stated, "over by our house on Oak Street," *Id.* at 20:21:24, and that they were "literally going to the grocery store." *Id.* at 20:21:02. Before returning to his vehicle, Officer Polsley asked "[n]o weapons in the vehicle?" *Id.* at 20:21:29. Defendant responded "No." *Id.* at 20:21:30. Officer Polsley testified Defendant appeared nervous during the stop and avoided eye contact. [ECF No. 34].

Officer Polsley returned to his vehicle and requested a status check for both Ms. Shields and Defendant. *Id.* at 20:22:06–46. Another officer arrived. *Id.* at 20:22:47. While awaiting the results of the status check, Officer Polsley returned to Ms. Shields and asked her "if you want me to, I'll show you what I'm talking about" to which Ms. Shields replied "yeah if you don't mind." *Id.* at 20:22:59–20:23:05. Officer Polsley also asked whether she had obtained the insurance information. *Id.* at 20:23:06. She had not yet, so he asked her to bring her phone when she exits to the back of the vehicle. *Id.* at 20:23:04–09. Officer Polsley identified the defective portion of the taillight for Ms. Shields and asked her to compare the driver's side taillight with the passenger side taillight. *Id.* at 20:23:15–17.

Officer Polsley asked Ms. Shields to stay at the rear of the vehicle instead of getting back in since she could not "drive anyway." *Id.* at 29:23:45. He approached the passenger side of the vehicle and asked Defendant if his license was valid. *Id.* at 20:23:53. Defendant responded "Yeah." *Id.* at 20:23:53. The following exchange occurred:

> Officer Polsley: No weapons on you? Nothing illegal I asked her the same thing.
> Defendant: No.

> Officer Polsley: Is it okay if I check your pockets and whatnot?
> Defendant: "Yeah you can check"
> Officer Polsley: "I'll have you hop on out real quick."[5]
> . . .
> Officer Polsley: "You said I'm good with checking your pockets?"
> Defendant: "Yeah you can check my pockets."

[ECF No. 32, at 20:24:11–20:24:31].

Officer Polsley began his search of Defendants pockets, which Defendant testified he "absolutely" gave his permission for. [ECF No. 34]. When Officer Polsley felt a hard object, he asked "[i]s that the keys to the car?" [ECF No. 32, at 20:24:47]. Defendant responded affirmatively. *Id.* at 20:24:49. Officer Polsley testified that, after he removed the car keys from Defendants pocket, he continued his search of Defendant's pockets and felt a hard object that was located inside Defendant's pants outside the pocket. [ECF No. 34]. He further testified that, although he could not determine what the object was, it is common for people to attempt to hide contraband near the groin area. *Id.*

Because he suspected the hard object was contraband, he withdrew his hand from Defendant's pocket and conducted a quick exterior pat of the front of Defendant's pants in the groin area. *Id.* Based on his pat down search, which he testified lasted a second or two, he recognized the presence of a firearm concealed inside Defendant's pants. *Id.* He testified it was apparent the concealed object was a firearm because it was "too big," "long[ ]," and "hard" to be drugs or anything else. *Id.*

Officer Polsley testified he was concerned for officer safety when he recognized the firearm, so he instructed Defendant to place his hands behind his back and directed the other officer to place Ms. Shields in handcuffs. *Id.* at 20:24:58, 20:25:05; *see also* [ECF No. 34]. Nine seconds

---

[5] Defendant does not contest Officer Polsley's ability to ask that he step out of the vehicle. *See United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017) (citing *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (intrusion of ordering passenger out of car is "minimal")).

had elapsed from the time Officer Polsley discovered the keys to when he instructed Defendant to place his hands behind his back. [ECF No. 32, at 20:24:55–58]. The following exchange occurred:

> Officer Polsley: You allowed to have that?
> Defendant: Have what?
> Officer Polsley: You know what dude don't be dumb. Is that why you didn't tell me about it?
> Defendant: About what?
> Officer Polsley: Dude come on. What is this? . . . Come on man don't treat me like I'm dumb. . . . Are you not allowed to have it? I'm not trying to undress you but I gotta get it, okay? Anything else concealed down there?
> Defendant: What you mean?
> Officer Polsley: There's a gun there dude don't be dumb.
> Defendant: I ain't got nothing to say.
> Officer Polsley: . . . I'm not trying to grab your junk I promise.

*Id.* at 20:25:11–55. Officer Polsley retrieved the firearm from Defendant's pants. *Id.* at 20:25:53–20:26:33. To do so, he testified that he unbuckled and unzipped Defendant's pants to retrieve the firearm. [ECF No. 34]. He further testified that he referred to Defendant's "junk," [ECF No. 32, at 20:25:55], because his "hand was right near" that area "to recover the firearm that was right there." [ECF No. 34]. Officer Polsley testified the firearm was located in the upper thigh area with the barrel facing upwards towards the Defendant's waist. *Id.* In contrast, Defendant testified Officer Polsley did not take the firearm from the area around his thigh. Rather, Defendant testified "the firearm was absolutely in my ankle area." *Id.*

After he retrieved the firearm, Officer Polsley asked Defendant "your pants up good enough so they don't fall down?" [ECF No. 32, at 20:26:22]. Officer Polsley then asked the other officer to place Defendant in his vehicle. *Id.* at 20:26:33. The firearm was a loaded Glock, model 21, .45-caliber pistol with an extended magazine capable of holding 26 additional rounds. *See* [ECF No. 36-1 ("Government's Exhibit 1")].

Officer Polsley stated to Ms. Shields that Defendant was "being real weird" about the gun. *Id.* at 20:27:29. Then, he ran a check on the gun's serial number and asked central command to

check for prior convictions. *Id.* at 20:27:30–20:28:38. The other officer present advised Officer Polsley that he recognized Defendant, who he believed had "one or two [convictions] on his record for drugs." *Id.* at 20:28:56–20:29:01. Central command informed Officer Polsley Ms. Shield's driver's license was not valid and that Defendant's driver's license was valid. *Id.* at 20:31:11. Officer Polsley testified that once he learned of Defendant's criminal history, he decided to arrest Defendant. [ECF No. 34]. The officers arrested Defendant. *Id.*

## II. LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993); *United States v. Bush*, 404 F.3d 263, 275 (4th Cir. 2005) (same).

"When police violate the Fourth Amendment's prohibition on unreasonable searches and seizures, the government may be forbidden from using the improperly obtained evidence at trial." *United States v. Villa*, 70 F.4th 704, 716 (4th Cir. 2023) (citing *Herring v. United States*, 555 U.S. 135, 140–42 (2009)). "The exclusionary rule 'generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights.'" *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014) (*quoting Penn. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 359 (1998)).

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981) (quoting *Rakas v. Illinois*, 439 U.S. 128, 132 (1978)). The

Government bears the burden of proving the admissibility of evidence obtained pursuant to a warrantless search by a preponderance of evidence. *U.S. v. Small*, 944 F.3d 490, 502 (4th Cir. 2019) (citing *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974)). Accordingly, evidence obtained through unlawful conduct may be excluded inasmuch as it is the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

When deciding a motion to suppress, the district court makes findings of fact and conclusions of law. *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005). *See also Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) ("[I]n the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example.") (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 623 (1993)).

## III. DISCUSSION

### A. The Traffic Stop

Defendant asserts the stop was not legitimate at its inception because Officer Polsley did not "reasonably observe[] a defect" pursuant to West Virginia Code §§ 17-C-15-1(a) and 17C-15-5 "before initiating the stop." [ECF No. 26, at 2–3]. The Government asserts Officer Polsley's perceived violation of West Virginia Code § 17C-15-1(a) created both reasonable suspicion and even probable cause because Officer Polsley "saw the taillight was partially burned out, which is clearly reflected in the dashcam footage." [ECF No. 31, at 4–5 (quoting *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification

for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop.")].

"A vehicle stop is a seizure within the ambit of the Fourth Amendment," *United States v. Womack*, 546 F. Supp. 3d 494, 498 (S.D.W. Va. 2021) (Goodwin, J.). Therefore, it "is subject to the reasonableness requirement of the Fourth Amendment." *U.S. v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018).

An officer may permissibly initiate a traffic stop on either of two grounds. "First, the officer's decision to stop a car is reasonable if he has probable cause to believe that a traffic violation has taken place." *Id.* (citing *Bowman*, 884 F.3d at 209). "Stops are analyzed under an objective test, which asks whether a reasonable officer would have stopped the car for a traffic violation, even if he would not have done so but for his suspicions of other criminal activity." *Id.* (citing *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993)). "Such a limited detention does not become 'unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity,' as long as the stop was justified at its inception." *Id.* (quoting *Hassan El*, 5 F.3d at 730). "In other words, the law allows for pretextual traffic stops; the pretext must be based on an actual traffic violation." *Id.* at 498.

"Second, an officer may initiate a traffic stop on the basis of a reasonable suspicion that criminal activity is afoot, even in the absence of probable cause." *Id.*; *U.S. v. Frazer*, 98 F.4th 102, 110 (4th Cir. 2024). "Such investigatory stops must be supported with 'articulable facts indicative of criminal misconduct.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000)).

"[T]he key difference between the probable cause and reasonable suspicion standards [is that]: 'probable cause looks for past or present illegalities' whereas the main function of the reasonable suspicion standard as announced in *Terry* is 'to grant officers the ability to prevent

future wrongdoing.'" *Womack*, 546 F. Supp. 3d at 498 (quoting *United States v. Perkins*, 363 F.3d 317, 326–27 (4th Cir. 2004)).

West Virginia Code § 17C-15-1(a) states "[i]t is a misdemeanor for any person to drive . . . any vehicle . . . which . . . is not at all times equipped with such lamps and other equipment in proper condition and adjustment as required in this article, or which is equipped in any manner in violation of this article, or for any person to do any act forbidden or fail to perform any act required under this article." W. Va. Code § 17C-15-1(a). West Virginia Code § 17C-15-5(a) states "[e]very motor vehicle . . . shall be equipped with *at least one tail lamp mounted on the rear*, which, when lighted as hereinbefore required, shall emit a red light plainly visible from a distance of five hundred feet to the rear[.]" W. Va. Code § 17C-15-5(a) (emphasis added). West Virginia Code § 17C-15-5(c) states, "[a]ny tail lamp or tail lamps . . . shall be so wired as to be lighted whenever the head lamps or auxiliary driving lamps are lighted." W. Va. Code § 17C-15-5(c). West Virginia Code § 17C–15–8(b) states "[w]hen a vehicle is equipped with . . . other signal lamps, such lamp or lamps shall at all times be maintained in good working condition." W. Va. Code § 17C–15–8(b).

In *Strick v. Cicchirillo*, the West Virginia Supreme Court of Appeals addressed "[w]hether the operation of a motor vehicle with one inoperable taillight is a misdemeanor traffic violation" pursuant to Chapter 17C Article 15 of the West Virginia Code. 224 W.Va. 240, 242, 683 S.E.2d 575, 577 (2009). The court concluded, even where one light is in working order, West Virginia Code § 17C-15-5(a) has nevertheless been violated when the "vehicle is equipped by design with two tail lamps." *Strick*, 683 S.E.2d at 578. The court further concluded it is nevertheless a violation to drive with one nonfunctioning taillight under other provisions because the statute likewise requires that all "equipment must be in working order," *id.* at 579 (quoting W. Va. Code § 17C–

15–8(b) ("When a vehicle is equipped with . . . other signal lamps, such lamp or lamps shall at all times be maintained in good working condition."). Finally, the court concluded that "a vehicle that does not have 'lamps and other equipment in proper condition,'" *id.* (quoting W. Va. Code § 17C–15–1(a)), is in violation of the statute. *Id.*[6]

At the hearing, Defendant argued Officer Polsley lacked probable cause for the stop because he would not have been able to identify the defective taillight from a distance of one or two cars behind. [ECF No. 34]. However, Officer Polsley testified (1) he was informed by another officer that the vehicle had a taillight that was not functioning properly and (2) he was able to see the defective taillight when he got within one car behind it, which was right before the vehicle pulled into the Piggly Wiggly grocery store parking lot. [ECF No. 34]. Defendant does not contest that the taillight was, in fact, broken. *Id.* The dashcam video supports Officer Polsley's credible testimony. Because the stop occurred at night, the portion of the lights on the left taillight that were burnt out are plainly visible on the dashcam video in the moments before the vehicle turns off the road into the parking lot. [ECF No. 32, at 20:18:08–10, 20:18:14–16].

Because a reasonable officer would have stopped the car for a traffic violation, *Womack*, 546 F. Supp. 3d at 498 (citing *Bowman*, 884 F.3d at 209), premised on the nonfunctioning taillight[7] pursuant to Article 15, Officer Polsley had probable cause to stop the car based on his belief that a traffic violation was taking place when he saw the partially burnt out taillight. [ECF Nos. 32, at 20:18:08–10, 20:18:14–16, 20:18:28, 20:18:47]. *See Strick*, 683 S.E.2d at 579; W. Va. Code §§ 17C–15–1(a), 5(a), 8(b).

---

[6] The statue also requires "[a]ny tail lamp or tail lamps . . . [to] be so wired as to be lighted whenever the head lamps or auxiliary driving lamps are lighted." W. Va. Code § 17C-15-5(c).

[7] Because I find Officer Polsley's testimony credible and because the defective taillight is plainly visible in the dashcam video, I do not address whether the collective knowledge doctrine supports the probable cause basis of the stop.

### B. Consent Search or *Terry* Frisk

Defendant first argues Defendant's "consent was expressly limited to [his] pockets and did not authorize a search of the thigh or [any] concealed area," and therefore Officer Polsley's search of the area further down Defendant's leg where the gun was concealed exceeded the scope of the consent. [ECF No. 26, at 3–4]. Defendant further argues, if the court determines the search exceeded the scope of Defendant's consent, Officer Polsley did not have reasonable suspicion that Defendant was armed and dangerous. *Id.* at 3. The Government asserts the consent search was valid. [ECF No. 31, at 7–10]. And that Officer Polsley—while permissibly searching pursuant to Defendant's consent—developed reasonable suspicion that Defendant was armed, justifying his subsequent *Terry* frisk. *Id.* at 9–10. The Government argues the frisk was justified because Officer Polsley "felt a hard object concealed elsewhere in Defendant's pants" "during the consensual pocket search." *Id.* at 10. The Government argues the *Terry* frisk was therefore lawful because Officer Polsley had reasonable suspicion to pat down the outside of Defendants pockets based on the totality of the circumstances. *Id.* at 10–11.

Before I determine whether the consent search was valid, I must analyze the testimony and determine the credibility of the witnesses. Critically, I **FIND** Officer Polsley's testimony completely credible. His testimony was straightforward and is entirely corroborated by the dashcam video. *Compare* [ECF No. 32, *with* ECF No. 34]. Although the consent and pat down search are not captured in the view of the camera, the audio is completely consistent with Officer Polsley's testimony.

Also, based on common sense, Officer Polsley's credible testimony, and the dashcam video, I **FIND** Defendant's testimony completely uncredible. Defendant testified Officer Polsley discovered the firearm in his "ankle area." [ECF No. 34]. Common sense cautions against

accepting this possibility. In any pair of jeans, it would be difficult to conceal around the ankle a gun the size of the gun at issue in this case—*i.e.*, a Glock, model 21, .45-caliber pistol with an extended magazine capable of holding 26 additional rounds. *See* [Government's Exhibit 1]; *see generally* [ECF No. 31, at 4 (image)]. But Officer Polsley also testified Defendant was wearing "tight" "skinny jeans." [ECF No. 34]. Defendant did not present any evidence to the contrary to rebut Officer Polsley's testimony. *See Dickerson*, 655 F.2d at 561 ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."). Additionally, in the dashcam video, Officer Polsley says, "I'm not trying to grab your junk I promise." [ECF No. 32, at 20:25:55]. This statement is consistent with Officer Polsley's testimony that the firearm was located inside Defendant's pants in the upper thigh area. *Id.* at 20:25:53–20:26:33. Common sense, again, counsels in favor of crediting Officer Polsley's testimony that he referred to Defendant's "junk," [ECF No. 32, at 20:25:55], in the dashcam video because his "hand was right near" that area "to recover the firearm that was right there." [ECF No. 34].

"[V]oluntary consent . . . is an exception to th[e] warrant requirement." *United States v. Boone*, 245 F.3d 352, 361 (4th Cir. 2001) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)). "The scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citation omitted); *United States v. Neely*, 564 F.3d 346, 350 (4th Cir. 2009) ("scope of a consent search is governed by what a 'typical reasonable person would have understood by the exchange between the officer and the suspect.'") (quoting *id.*); *United States v. Stinson*, 468 F. App'x 285, 288 (4th Cir. 2012) (affirming denial of suppression of a firearm found on a defendant's person where the exchange was "[s]ir, do you mind me *searching your person*

just to make sure that, you know, you don't have any drugs—weapons or drugs, anything that could harm me," to which the defendant replied "he did not 'mind at all.'") (emphasis added).

Here, Officer Polsley initially defined the scope of the requested search as "pockets and whatnot," [ECF No. 32, at 20:24:12], which Defendant agreed to.[8] *Id.* at 20:24:13. Seconds later, and before he began his search, Officer Polsley again defined the scope of the requested consent to search. This time, he defined the scope as "checking your *pockets*" and Defendant confirmed "yeah you can check my *pockets*." *Id.* at 20:24:29–31 (emphases added). The expressed object of the search was for Officer Polsley to check Defendant's pockets. Unlike in *Jimeno*, where the defendant granted the officer "permission to search his car, and did not place any explicit limitation on the scope of the search," 500 U.S. at 251, here, Defendant did place limitations on Officer Polsley's search.

Officer Polsley was permitted to "check [his] pockets." [ECF No. 32, at 20:24:31]. Officer Polsley did just that. Finding Officer Polsley credible, I conclude the consent search was lawful and that the search of Defendant's pockets did not exceed the scope of Defendant's consent.

Additionally, I conclude that Officer Polsley developed reasonable suspicion while searching Defendant's pockets sufficient to justify the subsequent *Terry* frisk. Officer Polsley testified that he felt a hard object while his hand was inside Defendant's pocket, which he suspected was contraband, because in his experience (1) suspects attempt to hide contraband inside their pants in that area, and (2) he had never encountered non-contraband stuffed into a suspect's pants. [ECF No. 34].

---

[8] Defendant does not argue his consent was not voluntarily given. *See Boone*, 245 F.3d at 362 ("[T]he government need not demonstrate that the defendant knew of his right to refuse consent to prove that consent was voluntary.").

Because Officer Polsley felt a hard object that he suspected was a gun during the consent search of Defendant's pockets, he had reasonable suspicion to conduct a *Terry* frisk.[9] *See Braxton v. Waterman*, 836 F. Supp. 3d 667, 676 (W.D. Va. 2026) (quoting *Minnesota v. Dickerson*, 626 F.3d 203, 213 (4th Cir. 2010)) ("During a permissible *Terry* . . . frisk, an officer may lawfully seize 'an object whose contour or mass makes its identity immediately apparent' as contraband, even if that object does not feel like a weapon."). Officer Polsley testified he immediately believed the object was contraband because it was "too big," "long[ ]," and "hard" to be drugs or anything else. [ECF No. 34]. Therefore, I conclude the *Terry* frisk was valid.

Accordingly, the dashcam video and Officer Polsley's testimony establish (1) he had probable cause to stop the vehicle based on the defective taillight pursuant to West Virginia Code §§ 17C–15–1, 17C-15-5, or 17C–15–8(b); (2) Officer Polsley's search of Defendant's pockets was lawful and within the scope of Defendant's consent; and (3) Officer Polsley had reasonable suspicion to conduct a *Terry* frisk.

## IV. CONCLUSION

For these reasons, the Defendant's Motion to Suppress Firearm Evidence, [ECF No. 26], is **DENIED**.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: November 6, 2026

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

[9] The Government presented an alternative argument regarding the validity of the *Terry* frisk based on other considerations, [ECF No. 31, at 10–11], but for the reasons just stated, I decline to analyze that argument.